UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

KAMPS, INC., et al.,            )
                             )
     Plaintiffs,            )          No. 5:18-CV-430-REW
                             )
v.                              )
                             )          OPINION & ORDER
MUSTANG AVIATION, INC.,       )

     Defendant.

*** *** *** ***

## I.    BACKGROUND

Despite their dueling motions for summary judgment, the parties agree about many of the facts leading up to this dispute, which arises out of a services contract. Sufficient material disagreements, though, prompt the need for a trial.

It began when Kamps[1] decided to buy an aircraft. *See* DE 45-1 at 1; DE 49 at 5. Kamps became interested in a Cessna 414A and entered into a purchase agreement that allowed for a pre-purchase inspection of the aircraft. *See* DE 45-1 at 1–2; DE 49 at 5; DE 49-2 (Used Aircraft Purchase and Sale Agreement). Victor Grahn of Executive Air Transport, Inc., acting as an agent for Kamps, contacted Mustang Aviation, Inc., about the inspection. *See* DE 49 at 5; DE 49-1, ¶ 10 (noting Grahn involvement). According to Mustang's (now-defunct) website, Mustang's services included AOPA[2] pre-purchase inspections. *See* DE 49 at 5; DE 49-7 (screenshot from

---

[1] Kamps, Inc., d/b/a Kamps Pallets, Inc., is the sole member of Kamps Air, LLC. *See* DE 1, ¶¶ 1–3. The Court throughout refers to the entities collectively as "Kamps."

[2] AOPA is the Aircraft Owners and Pilots Association, a self-described "not-for-profit organization dedicated to general aviation." *See About: History of AOPA*, AOPA, aopa.org/about/history-of-aopa (last visited Mar. 5, 2020). Kamps attaches to the memorandum in support of its motion for partial summary judgment an example of an AOPA aircraft condition checklist. *See* DE 49-18.

mustangaviation.com). Mustang informed Grahn about its services and fees and provided a "Work Request Form." *See* DE 49 at 5; DE 49-3, ¶¶ 4–6.

On Tuesday, February 6, 2018, Grahn emailed the completed form to Sean Smith, a Mustang employee. *See* DE 45-1 at 2; DE 49 at 5; DE 49-3, ¶ 7; DE 49-4 (Grahn email and work request form). The work request form identifies the aircraft and the customer (Grahn) and shows that the "work to be performed" is a "pre-purchase insp." *See* DE 45-2; DE 49-4. The form includes no details about the desired inspection. *See* DE 45-2; DE 49-4. Grahn's email noted that the aircraft would be arriving at Mustang's facility that day and that the autopilot required repair. *See* DE 49-4 at 2. Grahn requested that the pre-purchase inspection—though not the autopilot repair—be completed by Thursday afternoon or Friday morning. *See id.* Grahn explained that "[w]e have to make a decision on the aircraft by Friday." *See id.* A Mustang invoice shows that a "shop order" was opened that same day. *See* DE 45-1 at 2; DE 45-4; DE 49 at 6; DE 49-10. The invoice further reflects that the "pre-purchase exam" took 25 hours, cost Kamps $2,263.15, and was completed on February 8, 2018. *See* DE 45-4; DE 49-10.

A "pre-purchase examination report," also dated February 8, 2018, and signed by Mustang technician Kenneth M. Harker, lists general information about the aircraft, "unairworthy" items, "recommended" items, and "cosmetic" items. *See* DE 45-5; DE 49-6. In particular, the report identifies the aircraft by serial number, provides information about the engines and propellers, and describes the results of engine compression, an oil filter inspection, and "normal gear swings." *See* DE 45-5; DE 49-6. The report states that the log history is complete for certain components (airframe, engines, and propellers) but that the "engine entries are out of order" and "difficult to follow." *See* DE 45-5; DE 49-6. The report further indicates that the Airworthiness Directives

(AD) reports[3] are current but that the aircraft's registration is expired. *See* DE 45-5; DE 49-6. According to Harker's report, the inspection yielded four unairworthy items, fifteen recommended items, and seven cosmetic items. *See* DE 45-5; DE 49-6. Mustang provided the pre-purchase examination report to Kamps. *See* DE 45-1 at 2; DE 49 at 6.

On February 26, 2018, Kamps purchased the aircraft for $348,000. *See* DE 45-1 at 3; DE 49 at 6. The aircraft was then transported—by unknown means and persons—to Executive's facility in Michigan. *See* DE 49 at 7; DE 49-3, ¶ 16. On March 5, 2018, about a week after Kamps claims to have closed the purchase, an Executive invoice reflects an open shop order for another "pre-purchase inspection" on the aircraft. *See* DE 45-6; DE 49-17 at 9. Neither this invoice nor the record in general substantiates the results of this inspection. *See* DE 45-6; DE 49-17 at 9. *But see* DE 49-3, ¶¶ 16–17 (Grahn affidavit referencing approximately 130 discovered discrepancies and $100,000 in parts and labor as a result of Executive's "additional inspection of the aircraft"). Executive billed Kamps $2,838.76 for this second pre-purchase inspection, and the invoice identifies the shop order as "closed" as of March 28, 2018. *See* DE 45-6; DE 49-17 at 9. During this same window, on March 16, 2018, Executive invoices show that Executive undertook an "annual inspection" of the aircraft. *See* DE 45-1 at 3; DE 45-7 at 1; DE 49-17 at 10. The annual inspection cost Kamps $74,530.25 for parts, oil, supplies, fuel, freight, and labor, and the invoice suggests that the shop order "closed" on April 30, 2018. *See* DE 45-7 at 1, 26; DE 49-17 at 10, 35.

---

[3] "FAA's airworthiness directives are legally enforceable rules that apply to the following products: aircraft, aircraft engines, propellers, and appliances." 14 CFR 39.3. "FAA issues an airworthiness directive addressing a product when we find that: (a) An unsafe condition exists in the product; and (b) The condition is likely to exist or develop in other products of the same type design." 14 CFR 39.5. "Airworthiness directives specify inspections you must carry out, conditions and limitations you must comply with, and any actions you must take to resolve an unsafe condition." 14 CFR 39.11.

Around March 26, 2018, while both Executive shop orders were apparently pending, Grahn contacted Harker, the Mustang technician who had completed the first pre-purchase inspection. *See* DE 49 at 7; DE 49-3 ¶ 21. According to Grahn, Harker told Grahn that another company had since bought Mustang's assets and that Kamps should not have purchased the aircraft. *See* DE 49 at 7; DE 49-3, ¶¶ 23–24. Harker also advised Grahn that he had determined during the inspection that the aircraft's brake discs were at a minimum threshold and made a corresponding note on his checklist, but he failed to include this finding in the pre-purchase examination report. *See* DE 49 at 7; DE 49-3, ¶ 22. Perhaps in connection with this conversation,[4] Harker apparently provided Grahn with a copy of Mustang's inspection checklist. *See* DE 1, ¶¶ 31–32; DE 1-5 (blank Aircraft Condition Inspection Checklist/Report). During discovery, Mustang eventually substantiated Harker's brakes allusion by producing Harker's completed inspection checklist and handwritten notes from the pre-purchase inspection of the at-issue aircraft. *See* DE 49 at 8; DE 49-14.

Following Executive's inspections in spring 2018 and continuing through 2019, Kamps made substantial repairs to the aircraft, including replacing all twelve engine cylinders allegedly in accordance with the applicable Airworthiness Directive. *See* DE 45-1 at 8–9; DE 49 at 13–14; DE 49-1, ¶¶ 15, 17; DE 49-3, ¶ 23. Kamps states, and Mustang does not contest, that "AD 2016-16-12 applie[d] to the cylinders present in the Aircraft." *See* DE 49 at 14; DE 53 at 9–10. Executive

---

[4] Kamps now claims that "[t]he pre-purchase inspection was to be performed in accordance with a checklist." *See* DE 46 at 7. For support, Kamps cites the Grahn declaration, which states, "Mustang provided a checklist by which it would perform the pre-purchase inspection." *See id.*; DE 46-3, ¶ 8. These statements are notably silent about *when* Mustang provided the checklist but suggest, in context, that Kamps knew about the checklist at the point of contract formation. However, Kamps's complaint had alleged that "*[d]uring discussions regarding the improper inspection*, Mustang provided a checklist of items that it claimed to have checked during the inspection." *See* DE 1, ¶ 32 (emphasis added). Mustang admitted the truth of this allegation. *See* DE 8, ¶ 14.

invoices show that total repair costs have exceeded $100,000. *See* DE 45-1 at 8–9; DE 49 at 13–15; DE 49-1, ¶ 17; DE 49-17.

Notwithstanding general agreement about the above sequence of events, the parties do dispute two seemingly significant facts: who was present during Harker's inspection of the aircraft and what recommendation, if any, Harker made regarding Kamps's prospective purchase. There is also a foundational dispute surrounding Grahn's declaration that he "told Mustang that it was important to Kamps in purchasing the Aircraft to be made aware of all discrepancies on the Aircraft." *See* DE 49-3, ¶ 6.

For its part, Mustang's third affirmative defense mentions Kamps representatives that supposedly attended and participated in Harker's pre-purchase inspection. *See* DE 8, ¶ 24. Additionally, in response to Kamps's motion for partial summary judgment, Mustang maintains that two unidentified individuals inspected the aircraft concurrently with Harker and that Harker discussed the aircraft's condition with these individuals. *See* DE 53-1 (Harker Affidavit). Mustang's seventh affirmative defense claims that Harker advised Kamps not to purchase the aircraft. *See* DE 8, ¶ 31. Regarding Kamps's instructions on the desired scope of the inspection, the Harker affidavit indicates that "[t]he customer did <u>not</u> request that we perform an annual inspection." *See* DE 53-1, ¶ 6 (emphasis in original). This statement cuts against Grahn's assertion that "all" discrepancies were to be identified by Mustang and disclosed to Kamps. However, in the Complaint, Kamps alleged:

> 16. On January 31, 2018, Mustang provided information about its pre-inspection services and fees to Kamps' agent. Mustang indicated that during a pre-purchase exam, a technician would fulfill "due diligence of proper representation," including identifying both "unairworthy discrepancies" and "recommended or cosmetic discrepancies."

DE 1, ¶ 16. Mustang admitted the allegations of that paragraph. DE 8, ¶ 8. This goes far in defining what the parties intended and agreed to regarding the inspection.

Kamps, in reply, notes that Mustang previously admitted that no Kamps representative was present during the inspection. *See* DE 55 at 4; DE 55-1 at 4 (Answer to Interrogatory No. 2, "Mustang does not allege that an individual of Kamps was physically present during the pre-purchase inspection of the Aircraft."). For this reason, Kamps argues that the Court should disregard Harker's affidavit. *See* DE 55 at 5. Moreover, Kamps affirmatively asserts that Kamps was not present during the inspection and that no Kamps or Executive pilot flew the aircraft during this time. *See* DE 46 at 8; DE 46-16, ¶ 7. Kamps relies on affidavits—by Grahn and Terry Boer, Executive's President—to establish the lack of Kamps representatives on site. *See* DE 46-3, ¶¶ 9–10; DE 46-16, ¶ 6. For example, Grahn claims that "[n]either [himself], nor any other Executive Air personnel, was present during the pre-purchase inspection." *See* DE 46-3, ¶ 10. With respect to any Harker recommendation, Kamps observes that Harker, by affidavit, disavows any advice regarding the purchase, valuation, or repair cost, notwithstanding Mustang's sixth and seventh affirmative defenses, which had asserted the opposite. *See* DE 55 at 8–9. Kamps's reply does not explicitly address the conflicting narratives around the desired scope of the pre-purchase inspection, other than to argue that the Court should not consider Harker's affidavit because of its inconsistency with Mustang's discovery responses. *See* DE 55.

\* \* \* \* \*

Before the Court are cross-motions for summary judgment (DE 45 & DE 48), Kamps's motion for leave to file a sur-reply in opposition to Mustang's motion for summary judgment (DE 50), and Mustang's motion *in limine* (DE 51). The summary judgment motions are fully briefed. *See* DE 46; DE 47; DE 53; DE 55. Mustang did not weigh in on Kamps's motion for leave, nor

did Kamps separately respond to Mustang's motion *in limine*. Nonetheless, the matters are ripe for consideration.

As a housekeeping matter, the Court first addresses Kamps's motion for leave to file a sur-reply (DE 50). Mustang's reply in support of its motion for summary judgment identified several "objections" to evidence that Kamps presented in its response. *See* DE 47 at 4. Mustang's reply seeks to exclude the letter from Scott Wohnsetler (Mustang's former attorney), expert testimony from Grahn, and Kamps's use of Mustang's third and seventh affirmative defenses as evidence of Mustang's alleged fraud. *See id.* at 4–6. Kamps's proposed sur-reply responds to each of these objections, arguing that the Wohnsetler letter is not hearsay or otherwise inadmissible, that the Grahn declaration does not contain impermissible expert opinions, and that Mustang's pleadings (including affirmative defenses) are admissible non-hearsay. *See* DE 50-1.

"Although the Federal Rules of Civil Procedure do not expressly permit the filing of surreplies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. TVA*, 339 F.3d 454, 481 (6th Cir. 2003)).

Here, Mustang effectively raised some evidentiary objections for the first time in reply. Mustang initially argued in its motion for summary judgment (DE 45) that Kamps could not prove breach absent expert testimony, to which Kamps responded in part by tendering the Grahn affidavit (DE 46-3). In reply (DE 47), Mustang objected more specifically to Grahn's opinions, and Kamps's proposed sur-reply claims that Grahn offers only lay testimony. *See* DE 50-1 at 6. Because Mustang addressed the particulars of Grahn's testimony for the first time in reply, Kamps's sur-reply, on its face, is largely warranted.

However, two of the three objections in Mustang's reply closely mirror two topics in Mustang's subsequent motion *in limine*. *Compare* DE 47 at 4–5, *with* DE 51-1, ¶¶ 1, 3. The motion *in limine* includes two new objections and does not reassert the challenge to Kamps's use of Mustang's third and seventh affirmative defenses. *See* DE 51. Mustang's motion *in limine*, filed the same day as Kamps's sur-reply, therefore presented Kamps with an alternate means to counter Mustang's objections to Grahn's testimony and the Wohnsetler letter. Kamps did not do so.

In all, the combination of issues raised for the first time in reply, overlapping arguments, and the failure to separately address a motion *in limine* has muddled the record. Even though Mustang presented new arguments in a reply brief, Kamps's ability to respond was not entirely vitiated because Kamps could have, but did not, answer the substantially identical arguments in Mustang's later-filed motion *in limine*. Both the scheduling order and the Federal Rules contemplate opportunities for all parties to raise and brief these issues without resort to sur-replies. *See* DE 23; Fed. R. Civ. P. 26. But, given that Kamps's time to respond elapsed while the sur-reply motion was pending, the Court **GRANTS** DE 51 and fairly construes the sur-reply as Kamps's (partial) response to Mustang's motion *in limine*.

## II.     STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

"The standard of review for cross-motions [for] summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation." *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949–50 (6th Cir. 2009). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## III. ANALYSIS

### A. Mustang's Motion for Summary Judgment

Mustang seeks summary judgment on all claims. DE 45.

#### 1. Breach of Contract

Mustang first argues that the contract consists of the completed work request form and the email from Grahn to Smith in which Grahn requests a quick turnaround ("before Thursday afternoon/Friday AM") on the pre-purchase inspection. *See* DE 45-1 at 4–5. According to Mustang, Kamps lacks evidence of breach because the meaning of "pre-purchase inspection" is technical, and Mustang has not disclosed an expert that can testify that Mustang's performance fell below industry standards. *Id.* at 5–6. Mustang further observes that its performance was adequate; the problems identified by Executive during its 2018 annual inspection need not have been discovered during Mustang's more limited pre-purchase inspection. *Id.* at 6–7. In response, Kamps claims that expert testimony is unnecessary because "pre-purchase inspection" is an

ambiguous term, and the ambiguity permits the Court to look to extrinsic evidence to ascertain the parties' intent. *See* DE 46 at 11. Kamps points to the Mustang checklist, titled "Aircraft Condition Inspection Checklist/Report," to explain what the parties intended by "pre-purchase inspection." *See id.* at 12; DE 1-5. The checklist broadly covers seven areas, including landing gear, and requires the inspector to "[c]heck condition of discs and rotors" as a part of the brake check. *See* DE 1-5 at 2. Kamps notes that Mustang's report did not indicate the condition of the plane's brakes. *See* DE 46 at 13. Additionally, the checklist provides for an engine inspection, but Mustang did not identify or disclose later-found cracks in two engine cylinders. *See id.*

"To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson County Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). In other words, "[e]stablishing the existence of a contract is not sufficient to sustain a cause of action for breach of contract." *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007). "To consummate a binding contract . . . there must be a meeting of the minds of the parties or mutual assent to the same thing, and all material terms and conditions of the contract, including a certainty of the subject matter, must be agreed on." *McGeorge v. White*, 174 S.W.2d 532, 533 (Ky. 1943). "Whenever one enters into another's service, . . . the law interpreting the contract adds to its general words . . . his promise to bring to the work ordinary skill and capacity . . . ." *Menefee v. Alexander*, 53 S.W. 653, 654 (Ky. 1899) (quoting Bishop on Contracts § 1416).

In general, a court should construe a contract to effectuate the parties' intent by looking to "the four corners of the instrument without resort to extrinsic evidence." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). But, "[w]here a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving

the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Id.* "Parol evidence consists of evidence of agreements between or the behavior of the parties prior to or contemporaneous with the contract." *Luttrell v. Cooper Indus.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998). "Under the doctrine of contemporaneous construction, the courts are required to give great weight to the interpretation which the parties have placed upon an ambiguous contract." *Billips v. Hughes*, 259 S.W.2d 6, 7 (Ky. 1953). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell*, 94 S.W.3d at 385. The threshold question whether a contract is ambiguous is a question of law. *Id.* "However, once a court determines that a contract is ambiguous, areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder." *Id.*

Here, summary judgment is inappropriate because a reasonable juror could conclude that Mustang failed to conduct an adequate pre-purchase inspection, as agreed. The parties do not dispute that a valid contract existed between them, and they agree that the "Work Request Form" represents at least part of their agreement. The form's only relevant material term is "pre-purchase insp," which is ambiguous because reasonable minds could disagree about its meaning and scope. *See Cantrell*, 94 S.W.3d at 385. As a result, the Court looks beyond the four corners of the "Work Request Form" to determine what the parties intended by "pre-purchase insp." *See id.* The Grahn email makes clear that Kamps's objective in enlisting Mustang's services was to inform Kamps's decision whether to purchase the aircraft. And, Mustang's conduct (through Harker) demonstrates Mustang's interpretation of the term. Although Mustang (likely) provided the checklist post-inspection, not during contract formation or discussions surrounding performance, the checklist adds context to Mustang's (though not Kamps's) contemporaneous understanding of "pre-

purchase insp." Harker's report is also relevant because the purpose of the contract was to provide information to Kamps (not for Mustang to merely complete an inspection). The pleadings establish, as earlier noted, that Mustang agreed to provide a diligent inspection itemizing "unairworthy" and "recommended or cosmetic" discrepancies.

Even viewing the facts in the light most favorable to Mustang, Harker's report failed to comply with Mustang's checklist (certainly, a lane marker for its intended scope) in at least two ways. First, the "Paperwork/Notes" section requires the technician to check for AD compliance. DE 49-5 at 2. Harker apparently did so, as the report reflects research into "new AD 2017-10-09" and further states that "AD reports are current." *See* DE 45-5 at 1; DE 49-14 at 2. However, it is undisputed that AD 2016-16-12 applied to the aircraft's cylinders. Second, the "Landing Gear" section directs the technician to "[c]heck condition of discs and rotors." DE 49-5 at 2. Harker likewise completed this task, but his report includes no mention of the brake disc or rotor condition. *See* DE 45-5 at 1; 49-14 at 3. A brake inspection without a corresponding report to the customer defeats the purpose of the task. These actions, under a reasonable analysis, can be seen as noncompliant with the parties' deal. Again, the matters surely could fall within the realm of discrepancies Kamps was paying Mustang to diagnose. The Court disagrees on the need for expert

testimony[5] to measure performance, at least as to the factual and other topics here concerned. Also, reasonable minds could disagree about whether Harker's deviations from Mustang's own standards represent ordinary care and skill, an implied condition in all services contracts. *See Menefee*, 53 S.W. at 654. Accordingly, Mustang is not entitled to summary judgment on Kamps's breach of contract claim.

### 2. Fraud

Mustang contends that Kamps did not adequately plead fraud under Fed. R. Civ. P. 9(b) and that the evidence fails to satisfy one or more claim elements, including Mustang's knowledge and Kamps's reliance on unidentified false representations. *See* DE 45-1 at 10–11. Kamps avers that Mustang's Rule 9(b) argument is untimely and thus waived. *See* DE 46 at 14–15. Moreover, Kamps argues that it need not show Mustang's motive to defraud Kamps or what Mustang received in exchange for making a false statement. *See id.* at 15–17. As evidence of Mustang's "continuing" fraud, Kamps highlights Mustang's inconsistent statements in its pleadings. *See id.* at 17–18. For example, Mustang asserted as an affirmative defense that a Kamps representative was present during the inspection, a position that Mustang itself later contradicted in its responses to Kamps's interrogatories. *See id.* at 18. As far as fraud elements, Mustang supposedly induced Kamps to

---

[5] Grahn is mostly a fact witness in this case. He arranged the inspection and hired Mustang for Kamps. Thus, he directly knows what he intended, and his position gives him direct factual insight into Mustang's performance. Further, he was involved in the later Executive inspections, so he knows personally the factual product of those steps. He also was involved, directly, in repairs. Are his observations imbued with some level of expertise? Yes. A doctor ordering complicated medical equipment or chef ordering rare spices or engineer hiring a fabricator has a learned but factual role with respect to such a transaction and any resulting dispute over performance. Such a hybrid status does not convert Grahn from a principally factual witness into one giving expert testimony under Rule 26(a)(2) and Rule 702. In a real sense, Grahn **was** Kamps in this transaction, and he can testify as the key player in the full drama. The Court finds no surprise to Mustang, in this context, and the Court will take care to instruct any involved factfinder on the important considerations in evaluating all witness testimony.

enter a contract by promising that Mustang would identify both "unairworthy discrepancies" and "recommended or cosmetic discrepancies" and then failing to do so. *See id.* at 19. Kamps relied on Mustang's representations—the incomplete or inaccurate inspection report—in purchasing the aircraft. *See id.* at 20. Mustang intended or at least knew that Kamps would rely on the report. *See id.* As damages, Kamps points to the purchase price (which was influenced by Kamps's understanding of the plane's condition) and the funds Kamps has since expended to correct problems not identified by Mustang during its inspection. *See id.*

A Kentucky fraud claim has six elements: "a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). "[A] misrepresentation to support an allegation of fraud must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." *Filbeck v. Coomer*, 182 S.W.2d 641, 643 (Ky. 1944). "If, by the terms of a contract, a person promises to perform an act in the future and fails so to do, the failure is a breach of contract, not a fraudulent or deceitful act[.]" *Brooks v. Williams*, 268 S.W.2d 650, 652 (Ky. 1954). But, "[o]ne may commit 'fraud in the inducement' by making representations as to his future intentions when in fact he knew at the time the representations were made he had no intention of carrying them out[.]" *Major v. Christian Cty. Livestock Market, Inc.*, 300 S.W.2d 246, 249 (Ky. 1957).

Here, viewing the facts in the light most favorable to Kamps, the fraud claim fails. Kamps has not identified a Mustang representation concerning a present or pre-existing fact that meets the above elements. For one, nothing in the record supports Mustang's knowledge or recklessness as to the falsity of any such fact. At most, Kamps can argue that Harker did not exercise ordinary skill with respect to the brakes or the status of the AD reports. *See Menefee*, 53 S.W. at 654.

Additionally, Mustang's promise to complete an inspection cannot constitute fraud unless it can be shown that Mustang, at the time of the promise, had no intention to perform. *See Major*, 300 S.W.2d at 249. No reasonable juror could conclude, on this record, that the entire transaction was a sham by which Mustang intended, from the beginning, to deprive Kamps of the benefit of its bargain. Whether Mustang breached is a distinct question from whether Mustang committed fraud, and there is no triable issue concerning the latter.[6] For this reason, the Court grants Mustang summary judgment on Kamps's fraud claim.[7]

### a. Fraud by Omission

Kamps also argues in its response to Mustang's motion for summary judgment that Mustang committed fraud by omission. *See* DE 46 at 21–23 (discussing *Helm v. Ratterman*, 778 F. App'x 359 (6th Cir. 2019)). Mustang, in reply, counters that Kamps's complaint did not plead fraud by omission. *See* DE 47 at 11 & n.5. In any event, Mustang maintains that this claim should fail because Mustang disclosed the discrepancies about which it had knowledge. *See id.* at 11–12.

To prove fraud by omission, a plaintiff must show, as to an omitted fact, "a) that the defendants had a duty to disclose that fact; b) that defendants failed to disclose that fact; c) that the

---

[6] The Court does not view problems Harker failed to find as in any way supporting a fraud theory. If Harker underperformed, that may be a breach, but by not diagnosing a deficiency, Harker (i.e., Mustang) did not *defraud* Kamps. Further, litigative statements Mustang has made in the pleadings, while perhaps problematic, are not part of the fraud alleged in the Complaint.

[7] This ruling does not depend on Mustang's Rule 9(b) argument, which the Court deems waived. *See Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (noting that Rule 9(b) deficiency, absent a Rule 12(e) motion, is not appropriate dismissal basis); *Kallick v. U.S. Nat. Bank Ass'n*, No. 12–106–DLB, 2012 WL 5178152, at *4 (E.D. Ky. Oct. 18, 2012) (discussing and applying waiver of Rule 9(b) argument); Wright & Miller, 5A Federal Practice and Procedure § 1300 (4th ed. Aug. 2019 update) ("[S]everal courts have held that a party who fails to object to the manner in which fraud or mistake is pleaded at the pleading stage waives the specificity requirement set out in Rule 9(b)."). A motion under Rule 12(e) "must be made before filing a responsive pleading and must point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e). Mustang did not raise this issue in its answer and did not identify any Rule 9(b) defects by motion. *See* DE 8; DE 11.

defendants' failure to disclose the material fact induced the plaintiff to act; and (d) that the plaintiff suffered actual damages." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003). "A duty to disclose may arise from a fiduciary relationship, from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose same." *Smith v. GMC*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998).

> Fraudulent concealment implies knowledge of the material fact concealed. As to what constitutes a material fact, the question is whether it is likely to affect the conduct of a reasonable man and be an inducement of the contract.

*Faulkner Drilling Co. v. Gross*, 943 S.W.2d 634, 638 (Ky. Ct. App. 1997).

Here, putting aside doubts about whether Mustang had adequate notice of a fraud theory articulated for the first time at summary judgment, the claim elements are a poor fit on this record. For example, Kamps argues that Mustang's duty to disclose arose from the contract. *See* DE 46 at 23. But, at the time of the agreement, Mustang knew no more than Kamps about the aircraft's condition, so such a duty could not have arisen from Mustang's "superior knowledge." *See Smith*, 979 S.W.2d at 129. Kamps's reference to Mustang's "duty to disclose" appears to merely restate Mustang's contractual obligation to perform an inspection—performance that required "disclosure" of identified defects. *See* DE 46 at 23 ("Defendant had a duty to disclose the items it discovered during the Pre-Purchase Inspection and indicated on its Checklist and notes."). That the contract required inspection and disclosure does not transform any potential breach into fraud by omission. Summary judgment for Mustang is likewise warranted on this version of Kamps's fraud claim.

### 3. Negligent Misrepresentation

According to Mustang, this claim suffers from the same pleading inadequacy as Kamps's fraud claim. *See* DE 45-1 at 12. Also, negligent misrepresentation requires an affirmative misstatement, and Kamps's theory depends on Mustang's failure to disclose. *See id.* at 12–13. Finally, Kamps cannot demonstrate justifiable reliance. *See id.* at 13. Kamps did not directly respond to Mustang's arguments regarding this claim. *See* DE 46 at 2, 16–20.

Kentucky has adopted the Restatement's formulation of negligent misrepresentation. *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580–81 (Ky. 2004). The Restatement (Second) of Torts, § 552, provides, in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"A claim of negligent misrepresentation 'requires proof by clear and convincing evidence of a material representation that a defendant knew, or should have known, to be false.'" *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449, 453–54 (Ky. Ct. App. 2012). Additionally, "the tort of negligent misrepresentation requires an *affirmative false statement*." *Id.* at 454 (emphasis in original). "[A] mere omission will not do." *Republic Bank & Trust Co. v. Bear*, 707 F. Supp. 2d 702, 714 (W.D. Ky. 2010).

Most of this theory fails because a failure to disclose version does not survive the tort's elemental analysis. *See Collins*, 399 S.W.3d at 454. However, the report does inaccurately describe AD report currency. *See* DE 45-5 at 1. There are questions about the scope and effect of the representation, but Kamps cites the Continental directive itself as resulting in required replacement of all cylinders. If Harker negligently failed to secure accurate AD currency information and then

supplied an inaccurate status in the report, Kamps has the chance to recover under this tort theory for resulting losses it can prove.

### B. Kamps's Motion for Partial Summary Judgment

Kamps seeks summary judgment on its breach of contract claim. DE 48. Kamps argues that the following documents make up the parties' agreement: the Work Request Form, Mustang's checklist, and the pre-purchase inspection report. *See* DE 49 at 10. Per Kamps, Mustang breached the contract by failing to follow its own checklist during the inspection. *See id.* at 11–12. For example, Mustang did not identify or disclose the cracks in two engine cylinders, a dent in the bottom of the rudder, or cracks in the landing gear hardware. *See id.* at 12. Moreover, although Mustang apparently inspected the brakes, the report did not address the brakes' condition. *See id.* at 13. The report also stated that "AD reports are current," but AD 2016-16-12 applied to the engine cylinders, and there was no entry in the aircraft's logbooks concerning this directive. *See id.* at 13–14. As damages, Kamps contends that it would not have purchased the aircraft if Mustang's report had properly disclosed the needed repairs, or that Kamps—informed by an adequate pre-purchase inspection—would have negotiated for a lower price. *See id.* at 14. Kamps represents that the aircraft's repairs have cost approximately $100,000. *See id.* at 14–15. In response, Mustang argues that three reasons support denial of Kamps's motion: Kamps's reliance on inadmissible evidence; Kamps's incorporation of Mustang's checklist as evidence of breach; and issues of material fact regarding breach, including whether Kamps's proffered deficiencies in Mustang's inspection amount to breach. *See* DE 53 at 2, 6–10.

Although the Court leans significantly toward finding (at least partial) breach, ultimately, a jury must resolve the web of issues presented. First, the content of the contract is subject to debate. A jury will hear the evidence concerning the parties' agreed inspection scope and then

measure the performance. Mustang agreed to do an inspection and agreed that the inspection would probe for deficiencies. The checklist is a strong yardstick. However, whether Mustang actually and culpably missed deficiencies material to the inspection is for the jury to determine on this record. That Executive pursued two (parallel?) inspections in March of 2018—one nominally "pre-purchase" and one nominally "annual"—may suggest Kamps expected more from the Mustang report than Mustang intended to give. Mustang pleaded that it "discovered all faults in the aircraft that could have been discovered" within the limited inspection Kamps bought. *See* DE 8, ¶ 28. The jury will decide.

Grahn cites, "at least 20" missed discrepancies, but the record is indeterminate. The brakes are a good example. The inspection report is silent, but Mustang's notes show it perceived the brake rotors as "right at limits." Grahn cites "both brake discs" as beyond limits. DE 49-3, ¶ 19. Discs and rotors are not, per the record, the same thing. Further, it is not clear where the brake status falls as a category—airworthiness, recommended, or cosmetic. Likewise, the depth of engine analysis—whether a pre-purchase inspection goes deep enough to detect cylinder cracks— is one the jury will need to decide based on proof of where the parties' minds met. The checklist and AOPA exemplar do not indubitably include that degree of engine intrusion in the inspection ambit.

Further, the timing is of some concern to the Court. Mustang's inspection happened in early February. The Executive inspection(s) happened in late March or beyond. The Court queries whether the plane condition was static from date to date, a point not clear in the record, which could affect the performance measure for Mustang.

Lastly, even if the Court cherry-picked obvious deficiency issues, like the AD report currency, that would not eliminate the need for jury evaluation of other performance issues and

the required linkage between any contract breach and damages. The Court thus finds summary judgment unjustified and reserves these issues for the jury.

## C. Mustang's Motion *in Limine*

### 1. Expert testimony by Mr. Grahn

Mustang seeks to exclude any expert testimony from Grahn because Kamps did not identify Grahn as an expert or disclose an expert report. *See* DE 51-1, ¶ 1. Mustang identifies the following paragraphs from Grahn's affidavit as impermissible expert opinions: ¶¶ 12, 17, 18, 19, and 20. *See id.* at 2. These segments concern the discrepancies bearing on airworthiness and identify the problems Mustang should have discovered during the pre-purchase inspection. *See* DE 49-3, ¶¶ 12, 17, 18, 19, and 20. Kamps, in sur-reply, contends that Grahn's opinions are based on personal knowledge or observations. *See* DE 50-1 at 6–8.

Rule 701 permits lay witnesses to offer opinions that are "rationally based on the witness's perception[,] . . . helpful to clearly understanding the witness's testimony or to determining a fact in issue[,] and . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Lay witnesses may sometimes opine on particularized knowledge obtained "through employment or involvement in the day-to-day affairs of the business in question." *See United States v. Kerley*, 784 F.3d 327, 339 (6th Cir. 2015). However, the field of aircraft mechanics is sufficiently scientific or technical to often warrant expert testimony. *See Crouch v. John Jewell Aircraft, Inc.*, No. 3:07-CV-638-DJH, 2016 WL 157464, at *8 (W.D. Ky. Jan. 12, 2016) ("Expert aviation mechanics, however, possess specialized knowledge about the inner workings of such engines, and when such knowledge is applied to observations, it can 'help the trier of fact to understand the evidence or to determine a fact in issue.'"); *cf. Rose v. Truck Ctrs., Inc*, 388 F. App'x 528, 534 (6th Cir. 2010) (noting that expert's "experiences as a mechanic

give him specialized knowledge in the areas of truck mechanics and steering gears"); *Davis v. American Jet Leasing, Inc.*, 864 F.2d 612, 614–15 (8th Cir. 1988) (reviewing and approving qualifications of expert who testified about aircraft maintenance program).

As noted in n.5, *supra*, Grahn is something of a hybrid. He has factual knowledge regarding the contract terms and the parties' intentions. He has factual knowledge regarding airplane condition during the later inspections. He knows the content of the Mustang report compared to the condition he perceived in March of 2018. Grahn's expertise placed him in the position to make factual observations, and that expertise (he was the trusted contract rep for Kamps) modifies his testimony. Yet, this is not true expert testimony—it is testimony from a learned factual observer. The Court views it as proper factual testimony with some reliance on Rule 701 as well.

That said, the Court will not allow general opinions regarding airplane inspections, airworthiness, etc. Grahn can say what he knows and perceived, as a factual player, but the Court will restrict him (and Harker also) from going beyond that. The Court thus **DENIES** DE 51-1, ¶ 1, though on the stated terms.[8] *See also* n.5.

### 2. Sale of Mustang's business assets to Thoroughbred Aviation

Mustang moves to exclude evidence of the sale of its business assets. *See* DE 51-1, ¶ 2. Per Mustang, because this evidence relates to its financial condition, it is irrelevant and inadmissible. *See id.* Kamps did not respond to this argument.

"[E]vidence of a party's financial status should be excluded at trial because of the danger of prejudice that such evidence creates." *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 280 (Ky.

---

[8] Rule 26 would not have required a formal report in this context. Grahn's basic observations appeared in the Complaint and have been known to Mustang throughout the case.

Ct. App. 2006). For this reason, and because Kamps has not otherwise supported the admissibility of this evidence, the Court **GRANTS** DE 51-1, ¶ 2.

### 3. Testimony regarding settlement offers or negotiations

Mustang invokes Rules 408, 502, and 802 to bar the Wohnsetler letter. *See* DE 51-1, ¶ 3. Mustang argues that the letter is inadmissible as a settlement offer or negotiation, that the letter contains inadmissible hearsay, and that attorney-client privilege protects the letter's contents. *See id.* Kamps, in sur-reply, maintains that a hearsay exception applies because Wohnsetler was Mustang's agent. *See* DE 50-1 at 3–4. Additionally, according to Kamps, the letter is not an offer to compromise, and there are admissible forms of the information within the letter (such as Harker's statements, since Harker will be a witness at trial who can testify to his personal observations and knowledge). *See id.* at 4–5.

Rule 408 generally bars the admission of evidence of "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise [a disputed] claim" and "conduct or a statement made during compromise negotiations about the claim." Fed. R. Evid. 408(a)(1), (2). Rule 502 deals with waiver of the attorney-client privilege, which Kentucky defines as protecting "confidential communication[s] made for the purpose of facilitating the rendition of professional legal services to the client." *See* Fed. R. Evid. 502; KRE 503(b). "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." KRE 503(a)(5). Rule 802 is the general rule against hearsay, which is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801; Fed. R. Evid. 802.

Here, none of Mustang's proffered bases merits exclusion. The letter self-evidently does not constitute an attempt to compromise or "a statement made during compromise negotiations." *See* Fed. R. Evid. 408(a)(2). Attorney-client privilege cannot protect the letter because it was sent to opposing counsel—perhaps the opposite of "confidential." *See* KRE 503(a)(5). The letter, from Mustang's agent, is not hearsay. For these reasons, the Court **DENIES** DE 51-1, ¶ 3.

### 4. Evidence relating to consequential damages

Mustang challenges Kamps's Rule 26 disclosures pertaining to damages. *See* DE 51-1, ¶ 4. Mustang argues that Kamps's $95,000 repair costs are not expectation damages—because Kamps did not contract for a new aircraft—and that these damages are too speculative. *See id.* Mustang contends that Kamps may have purchased the aircraft even had it known about the undisclosed or undiscovered defects and that the repairs are not a consequence of Mustang's breach. *See id.* Mustang likewise disputes the cost for a replacement aircraft and claims that Kamps failed to mitigate its damages with respect to the plane trips that the purchased aircraft could not accommodate. *See id.* Finally, Mustang avers that punitive damages are not available for a breach of contract. *See id.* Kamps did not respond to any of these arguments.

"Damages for breach of a contract are normally that sum which would put an injured party into the same position it would have been in had the contract been performed." *Univ. of Louisville v. RAM Eng'g & Constr., Inc.*, 199 S.W.3d 746, 748 (Ky. Ct. App. 2005). Consequential damages for breach of a contract may be recoverable when the type of harm was foreseeable to the parties. *U.S. Bond & Mortg. Corp. v. Berry*, 61 S.W.2d 293, 297 (Ky. 1933) ("In order to recover special damages the party sought to be charged must have had notice of such circumstances at the time the contract is made, and in such a way that he must know that the person with whom he is contracting reasonably believes that he is accepting the contract with the special condition.");

*Clark v. Life & Cas. Ins. Co.*, 245 Ky. 579, 581 (Ky. 1932). "In no case shall punitive damages be awarded for breach of contract." KRS 411.184(4); *Faulkner Drilling Co. v. Gross*, 943 S.W.2d 634, 638–39 (Ky. Ct. App. 1997) ("Although the statute and the case law are clear that punitive damages are not recoverable for mere breach of contract, it has been held that if the breach included separately tortious conduct, punitive damages may be awarded.") (internal citations omitted)).

Here, Kamps may not recover damages for the replacement aircraft or punitive damages, but some of the repair costs may be compensable, depending on how the fact-finder ultimately resolves the breach issue. Kamps did not contract for Mustang to inspect and then repair the aircraft to the point of being airworthy, so Mustang could not have foreseen damages flowing from a land-bound aircraft. *See Berry*, 61 S.W.2d at 297. And, because the Court has found for Mustang on Kamps's fraud theory, punitive damages are unavailable as a matter of Kentucky law. *See* KRS 411.184(4). On the other hand, the extent of Mustang's breach, if any, will dictate the "damages flowing from the breach of contract," the final claim element. *See Abma*, 326 S.W.3d at 8. At this stage, before any fact-finder has concluded that Mustang breached the contract, the Court declines to prospectively limit Kamps's repair cost recovery. As a result, the Court **GRANTS IN PART** and **DENIES IN PART** DE 51-1, ¶ 4.

## IV.  CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1. The Court **GRANTS IN PART** and **DENIES IN PART** DE 45;

2. The Court **DENIES** DE 48;

3. The Court **GRANTS** DE 50; and

4. The Court **GRANTS IN PART** and **DENIES IN PART** DE 51.

This the 27th day of March, 2020.



Signed By:

*Robert E. Wier*

**United States District Judge**